Good morning. May it please the Court, Counsel. I'm Lisa Rasmussen, and I'm going to be arguing on behalf of Donna Cangelosi et al., the direct lenders. And with me is William Cohan. He will do rebuttal, and I will be in charge of splitting our time. Okay. Okay. The Court had issued an order on the 22nd or 23rd of October asking us to come prepared to address the bankruptcy issue, and I don't know if you want me to do that now or if you have specific questions related to that. Well, I think you should. Okay. I will then. I'll start with that. It's our position that this Court has jurisdiction, certainly, to hear oral argument today. The – there has been a motion to dismiss and or transfer venue in the New York bankruptcy case. It was filed in the Southern District of New York. The trustee filed the motion to dismiss or transfer venue to the Nevada Bankruptcy Court. And I – that hasn't been resolved yet. That's going to be resolved in November. It's our position that the Bankruptcy Court certainly is the one who appropriately lifts the stay, but that this Court has the ability and the capacity to determine its own jurisdiction and certainly to entertain oral argument today. Could we defer submission, hear the argument, and then wait and see what the Bankruptcy Court decides about venue? Absolutely. And I don't think that that would be inappropriate at all. I hear the argument now, and you wouldn't have to come back and argue it. Right. And we could supplement this Court with any further action on the motion to lift stay. We did file a motion to lift stay for the purpose of this argument. It just hasn't been resolved yet. And the same is true with the motion to dismiss or the motion to transfer venue. Okay. So having said that, I think that this – obviously, this is an appeal of a preliminary injunction. This preliminary injunction was originally entered in November of 2007, and it was to the benefit of COMPAS, and it did make reference to SILAR as well. And I don't know if the Court needs clarification on the relationship between the parties. I'm happy to address that if the Court has questions. The preliminary injunction became moot when COMPAS left. COMPAS dissolved and was no longer participating as the loan servicer. They had purchased these assets and right to service pursuant to the loan servicing agreement that existed at the time from the Bankruptcy Court. This ended up in the district court. The district court issued the preliminary injunction. No bond was set. And COMPAS was then gone in October, probably late September, but October of 2008. Why wasn't a written objection made to the original P.I.? I don't know the reason for that. I wasn't counsel at the time, and I don't have an answer to that. I wasn't counsel for any of the direct lenders at that time. When I entered my appearance in the fall of 2008, COMPAS or SILAR had just filed its notice saying, by the way, we're taking over, we've foreclosed on COMPAS's rights, and we're taking over. So it was then, and then when we got the receiver's report basically setting out all the nefarious acts of COMPAS, it was after that that we filed the motion to vacate the preliminary injunction, because we deemed it moot, since COMPAS was no longer in the picture. The district court at that point invited COMPAS and then Asset Resolution, who was formed for the purpose of foreclosing on COMPAS's assets, apparently SILAR formed Asset Resolution. The district court invited them to seek what was termed as an extension or substitution of the preliminary injunction. So when we had the hearing on that, I pointed out that COMPAS had already done substantial damage to the direct lenders. At that point, we weren't able to articulate the exact damage, because we didn't have the documents. We certainly didn't have the benefit of the bankruptcy schedules that we just received. And now we're in a position to articulate the exact damage. But basically COMPAS absconded with millions of dollars that remains unaccounted for. At that point, when we were arguing the preliminary injunction, I said that we don't know who Asset Resolution is. They're just a shell. They were simply just created by SILAR for this purpose. And a bond, if the court is going to extend the preliminary injunction, a bond is absolutely required. But beyond that, there was no basis to issue a preliminary injunction, because there are monetary damage is the remedy in this case. The district court didn't do the analysis of likelihood of success on the merits, whether the equities tip in favor of the party that the preliminary injunction benefits. The winter analysis that is applicable, none of that was done. There was no bond analysis done. There was simply no basis to issue it in the first place. If the SILAR or Asset Resolution would be damaged, they can certainly be compensated by monetary damages. So there is, as a matter of law, there is no irreparable harm and no basis to issue the preliminary injunction in this case. And certainly it was error on the part of the district court to issue it without any bond requirement. And I think that there's no better argument for the fact that a bond should have been issued than the fact that Asset Resolution has now filed bankruptcy. They have been controlled by SILAR and they've determined when they have assets and when they don't. And when things weren't going their way in the district court, they filed bankruptcy and here we are. So the damage to the lenders is irremediable by virtue of the preliminary injunction, because what the preliminary injunction has done is hogtied them. It has tied their hands. These companies have come in and controlled their assets. They have in many instances allowed these properties to go into foreclosure and then had tax sales. And now the direct lenders end up with either very, very little or nothing, and the disputed funds remain in some instances in escrow accounts, but not in all instances. There are substantial disputed funds that are simply unaccounted for. And in all honesty, I didn't – that is provided – that information is provided to the court by means of my 28J supplement letter, because I attached the bankruptcy schedules, but we didn't know that information until really the 14th of October when we were able to look at what they actually claim as assets. And interestingly, they claim that they have $10 million in real property assets and only $22 million in liabilities, but they don't account for any of the liability to all of the direct lenders by virtue of the ongoing litigation in the district court. And the $22 million in liabilities that they claim is all taxes that they owe, but property taxes to different counties and assessors. So they haven't – they haven't done the servicing advances that they were supposed to do. They have caused real substantial and multimillion dollar – hundreds of millions of dollars of harm to these direct lenders. And the direct lenders, meanwhile, sit with their hands tied by virtue of this preliminary injunction that never should have been issued in the first place. There was simply no basis for it. I think that I would like to reserve some time for rebuttal. If you have questions, I'd be happy to address them. Well, only one, and that is regarding the appellants. Are there any now here before the panel who did not receive notice prior to that modification? There are – I'm not sure if any of the appellants that I named in this case didn't receive notice. What happened was they formed LLCs because there are – there were over 3,000 direct lenders. They formed 50 LLCs to be able to litigate their interest and their right to terminate each loan. And so then the district court said they couldn't do that. So now we have essentially team captains, loan captains for each loan. There's a plaintiff – essentially at least one plaintiff in the district court litigation for each loan. So my direct lenders – and what I'm arguing to you today goes to many, many of the direct lenders, not just the 18 that I named in this appeal, because it would be cumbersome to name all of them. So many of them didn't receive notice when the original preliminary injunction was issued, and whether or not they received notice on the motion to vacate or the motion to substitute and extend filed by opposing counsel is debatable as well. At that point, we did have what I would call loan captains and key people that were representative of each loan in the litigation. But I can't confirm that anyone received – anyone and everyone received notice. This is a messy case, isn't it? Very messy. And very unfortunate. If it were to be remanded for a hearing on the bond issue, would that be an idle act, or would it? I don't believe it would be an idle act. I believe that there exists a firm basis to transfer the case if the bankruptcy is, in fact, not dismissed, to transfer it to Nevada. And I have every reason to believe that there would be a motion to withdraw the reference and that the case would end up back with Judge Jones, because that's how it got there in the first place. And it was error. But if this Court directed him to do it, I'm certain that he would do it, and now he has the benefit of knowing all of the things that we've learned really since this case was briefed even. I think that we fully briefed this around mid-July, and so many things have happened, including violations of the injunction on the part of SILAR and Asset Resolution. They violated the injunction and sold properties without obtaining permission from the Court. So at this point, I'm sure that he would be of a different mindset, but certainly that is one remedy that the Court could entertain. But I also think that there was no basis to issue it. There's no basis for this extraordinary remedy when all we're talking about is monetary damages. Okay. And I'll reserve the rest of the time for Mr. Cohan. Thank you. May it please the Court. My name is Catherine Windler. I'm an attorney for Asset Resolution, LLC. The only question before this panel today is whether the automatic stay applies to this proceeding. Our position is, yes, of course it does. It arises out of the filing of the 15 petitions under Title XI in the Southern District of New York on October 14, 2009. No party is released from the automatic stay of Title XI until such time as the bankruptcy court lifts that stay. The issues that are presented in this appeal, as are set forward in the briefs before this Court, necessarily will impact the rights of those Chapter XI debtors and of their creditors. It is true as to all appellees that are here before this panel, and that is because this panel cannot rule on the rights of SILAR advisors or SILAR Special Opportunities Fund LP without negatively impacting asset resolution and its SPE subsidiaries. That is because of the fact that the interests of SILAR, of the two SILAR entities and asset resolution are so entwined in the matter that is before this panel. Any ruling here will necessarily affect the administration of the bankruptcy estate. It is the bankruptcy court and only the bankruptcy court that can lift the stay and can determine what actions that may be taken with respect to the assets and the bankruptcy debtors. I suppose this panel could ask us, what is the practical effect that would occur if this hearing proceeds as to any of the entities, including the SILAR entities, or as to the preliminary injunction? What happens to the money? We don't know precisely the answer to that question. But we do know that these Chapter XI debtors have fractional interests in the cash proceeds that were generated from either the sale or the resolution of those loans. And we know that these Chapter XI debtors have claims against the cash and the properties that are now under the sole jurisdiction of the bankruptcy court. So we know that any ruling by this panel would absolutely have some effect. And any effect is what the bankruptcy stay protects against. Indisputably, the real estate properties, the REO entities, and the cash are all held by asset resolution or the SPE debtors. The cash that my colleague referenced earlier is cash in New York bank accounts that are set up in the names of those debtors. The proceeds of the properties that are held in the SPEs are solely within the bankruptcy court. Therefore, any dispute about those proceeds is solely before the bankruptcy court. And an action in the bankruptcy court later on may end up resolving those issues or may render moot this action entirely. So based simply on judicial economy and efficiency, this Court should enforce the stay. Now, is there – let me review the betting. There's been a motion to lift the stay? There has been a motion to lift the stay solely with respect to the conduct of this appeal. And that motion has been set for hearing on November 24th before the Honorable Judge Gonzales of the Southern District of New York. Now, assuming that the stay is lifted, which is an assumption I don't know how to predict, I'm just assuming that the stay is lifted, then what? If the stay were to be lifted, then the bankruptcy court would necessarily have to be instructing the parties that it would rely on this Court's ruling with respect to the preliminary injunction and the preliminary injunction's effect on those assets. Right. So assume for the moment that the stay is lifted. Do you want to talk about – talk to us now? Do you want to come back in a few weeks? I mean, how do you want to deal with this? First of all, we believe the likelihood that the stay is lifted will be extremely remote. I'm not predicting one way or the other. Even if the stay were lifted, it is very likely that such an order would encompass further conditions as to what could happen then to the very assets that are the subject of this preliminary injunction. And let's go back to the injunction. This injunction essentially did two things. It protected the servicing rights of the debtors and said that the appellants could not interfere in all need of those servicing rights. And clearly, those servicing rights are assets in the bankruptcy case. And it further stated that certain use of the money could be drawn from the proceeds of sales or deeds in lieu or foreclosures or settlements of the various properties. If the injunction were to be modified or affected by any ruling of this court, it would immediately raise the question as to what could now happen with the cash and the properties. It's for that reason that this court is simply precluded from entertaining any argument on this appeal other than the stay or from taking any action on this appeal because the first and only step that could be taken is that Judge Gonzalez in the Southern District of New York would have to decide whether to lift the stay. If he did so, we presume that there would be conditions that would attach to that, and we would have further information then from him as to what steps he would expect both parties to take with respect to the cash and the properties. Thank you. So you really don't want to talk to us about what might happen if the stay were just lifted? I represent asset resolution, and I don't. I think we have to stick with the position that the stay has not been lifted, and until that happens, nobody can act. My colleague represents CYLAR and the CYLAR entities, and I think he will address the merits. Well, you're going to split. You did not notify us in advance. I apologize. No, it's okay. I represent only asset resolution. Good morning. Phil Hymanson on behalf of CYLAR. With the Court's permission, I will not lose an opportunity to address the issues while we are here. I think the Court asked very early on why wasn't an objection made to the preliminary injunction in a timely manner. It's a very good question. Fourteen months is how long it was between the filing and the objection. The – if the standard is abuse of discretion, then it certainly would not have taken 14 months to make that determination. And if you're going to review the preliminary injunction, there has to be new information, not just the same old information that was out there before, which I believe, as we sit here today, is the same, with the exception of the bankruptcy. And I know better than to try and guesstimate what a bankruptcy court will do. So the issue is very clear from CYLAR's position. The preliminary injunction that was initially put in place, if you look to the circumstances during that timeframe, this was a time when the action was coming out of bankruptcy court, and the – there was – Compass had purchased an interest as a servicer. Some of the direct lenders decided that that wasn't in their best interest, wanted to create their own LLCs, wanted to create their own servicing groups, and went beyond – above and beyond the call of duty to the point of being held in contempt by Judge Jones in actually sending a letter out saying that Compass was terminated, actually sending a letter out to the other direct lenders. And as we understand, there's between 2,000 and 3,000 direct lenders saying that if you pay any money to Compass, you do so at your own peril. The court found Ms. Cangellosi in contempt. The court said retrieve those letters. There is no termination. In fact, there's still a termination hearing on – on file to be heard. And it was under those circumstances that the judge said at that point in time, I'm going to have – I'm going to put in place a preliminary injunction. And the reason I'm going to do that is because I'm going to maintain the status quo. This is going to be a very aggressive, difficult litigation. And if I don't keep some balance here, we won't know who does what. Compass certainly purchased for – for millions of dollars the rights to service. And within those rights, there were certain waterfall provisions that allowed them to take certain amounts of money. The court was concerned that they would – he wanted to protect their – their rights, but he also wanted to protect the direct lenders. So what he did is he said if anything was going to be done, funds would have to go into escrowed accounts. So he still felt, the court still felt that they had – he had control over the – over the funds. And he did dismiss the need for a bond because he didn't believe that without order of the court, funds would be – would be released because they were remitted into escrow accounts. So the court, understanding this was going to be a very difficult litigation, tried to keep some control over what was going on. And by doing so, it has – it has impacted both sides. The direct lenders say that they can't sell their properties. They can't do anything because of the preliminary injunction. Not the case. It's difficult because of the real property issues out there to sell these properties. But Compass, Seiler came forth and they put forth a sale for one of the properties for $16 million. It was rejected. Brought forth a sale for $12 million. It was rejected. Brought forth a sale for $8.5 million prior to it – to the property going into default. And it was the individual that Seiler brought to the table that actually entered into, with Seiler's assistance, a joint venture with the direct lenders to take over that property and hopefully rebuild the value. So the preliminary injunction works both ways. There are days when it's beneficial to the direct lenders and there are days when it's beneficial to Seiler. But it shouldn't at this point. I don't think there's a basis for this Court, with all due respect, to make a determination because, one, it's not timely, and, two, there is no abuse of discretion given the totality of the circumstances. And as such, the – I don't believe that a ruling is necessary from this Court for those reasons. Thank you. Roberts. Go ahead. Good morning, Your Honors. William Cohan. How much time do I have? The light just already went yellow. Look at your little thing. It says 437. Oh, I've got lots of time. There you go. Okay. Plenty of time. Okay. And it's on its way down. Yes, I see it shrinking, but I was intrigued by the reference, first of all, if I may achieve by not doing anything here today after all the work that everybody's done to prepare to resolve this question. Really, the question being whether the preliminary injunction should be vacated in the subsidiary questions. If not, then should a bond be posted? What's happened here is that the money behind Seiler has played fast and loose with the Court from day one. They set up Compass as a shell and a sham. They've used it as both a shield and as a sword, as a shield to shield them individually from the consequences of their tortious misconduct that's been enumerated in excruciating detail in the briefs and in hearings that have been held, none of which has been justified by anything that the direct lenders have done, which has been to try and preserve what's left of their collateral. When Judge Jones has recently issued some rulings which have demonstrated that the claims of entitlement have been ridiculously exaggerated. In fact, the actual award that was given by Judge Jones for servicing fees in response to a $2 million demand was $94,000. That's when Seiler's money decided that it was going to remove this Court's or attempt to remove this Court's and all the Nevada Court's jurisdiction in favor of a bankruptcy in New York, which should stop us from doing anything while the Compass principles. Seiler is really, as I say, the money. They set up another shell entity. That's Seiler. Now, Seiler's bankrupt. It's bankrupt because the money behind it, the people in New York whom Ms. Wendler informed me were the people who were the nerve center. Well, as I said to her, they've got a lot of nerve, and I guess it's centered in New York. But that shouldn't oust the district court that spent almost three years dealing with all the details, and now this court of the jurisdiction to decide things just because they might be decided adverse to the big money in New York. Now, the argument that was made by Mr. Harmonson just a moment ago about control is kind of laughable, because there's only been control exerted to prevent the direct lenders from doing anything to preserve their collateral, whereas Compass, which is just, as I said, a shell created by Seiler, has been completely out of control. And they continue to be out of control. That's why they have now engaged in this eleventh-hour ploy to divest this court of jurisdiction. So as Judge Goodwin just suggested initially, should this court entertain this, obviously you've decided to do it. Obviously, we can wait a little while before – I shouldn't say we. Your honors can wait a while before you decide it, because we believe in response to the motion that was filed by the bankruptcy trustee in New York to kick the case back to Nevada or throw it out of court entirely, this issue is going to have to be addressed. And the issue is, are the direct lenders going to be permitted to do anything to protect their collateral? Or are the principals behind Seiler, the New York money, going to be allowed to continue to play fast and loose with the district court of Nevada, this court, and whatever other court they might decide to go to if they don't like the decisions that are forthcoming or that have just been made? So we believe it's pretty clear that your honors will be able to have jurisdiction to vacate this injunction, which was entered initially at a time when no one was predicting that Compass, as the Seiler shell, would violate the direct lender's rights so frequently, so prodigiously, and so egregiously as they have. But when a new shell was substituted and Ms. Rasmussen was counsel, she quite properly objected to the substitution and demanded that either the injunction be dropped or at least the bond be imposed to give some protection to the direct lenders. And that's what before your honors. And that's what we think is a simple, yes, there should not be an injunction in place to protect these people who are pillaging the direct lenders. And I have a few seconds left. No, you're in deficit, but we'll make you a gift of those seconds. Thank you very kindly. I don't want any more deficits. And thank you for your patience, your honors. Thank both sides for their argument. Ganglossi v. Seiler Advisors now submitted for decision. Thank you.
judges: Mills, Goodwin, Fletcher W.